## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| ANNETTE DOMENGEAUX | * | CIVIL ACTION NO. 05-2215 |
| VERSUS | * | JUDGE DOHERTY |
| COMMISSIONER OF SOCIAL SECURITY | * | MAGISTRATE JUDGE HILL |

## <u>REPORT AND RECOMMENDATION</u>

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993.  Annette Domengeaux, born August 25, 1975, filed an application for supplemental security income on September 24, 2001, alleging disability as of February 12, 1999 due to injuries sustained after she was run over by an automobile.[1]  This claim was consolidated with a new supplemental security income claim filed on December 15, 2004.  (Tr. 513-15).

This is the second time that this case has been before the Court.  On December 16, 2004, the undersigned issued a Report and Recommendation in Docket No. 04-0437 recommending that the Court remand this case to the hearing level with

---

[1]Claimant filed a previous application on May 25, 1999, which was denied initially and on reconsideration.  The application was dismissed after claimant filed an untimely request for hearing.

instructions to the Administrative Law Judge to order testing of claimant's right arm as recommended by Dr. Harold Heitkamp and to assess her residual functional capacity in light of this impairment. (rec. doc. 11). By Judgment entered on January 19, 2005, Judge Rebecca F. Doherty adopted the undersigned's recommendations. (rec. doc. 12). On March 18, 2005, the Appeals Council remanded this case to the ALJ for further proceedings.

On remand, a hearing was held on August 3, 2005 before ALJ Lawrence Ragona. (Tr. 666-97). On September 15, 2005, the ALJ issued another unfavorable decision. (Tr. 427-33). Claimant filed for judicial review of that decision with this Court on December 21, 2005.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's decision of non-disability. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions regarding claimant's disability is not supported by substantial evidence,

based on the following:[2]

**(1) Consultative Examination by Dr. Harold Heitkamp dated February 28,**
**2002**.  Claimant complained of pain in the lower back, tailbone, right hip and right

knee, and muscle spasm in the right side of her neck with headaches.  (Tr. 320).  She

walked with a lumbering gait, with her knees slightly flexed favoring her right leg.

(Tr. 321).

Examination of the head and neck revealed no spasm.  Range of motion of the

cervical spine was normal on forward flexion, extension and left lateral flexion, and

was 40 degrees on right lateral flexion.  Rotation was 75 degrees right and 70 degrees

left.

Claimant's shoulders had full range of motion with no tenderness.  She had

normal biceps and triceps muscles, with no swelling or tenderness in the wrists.  Hand

strength, grasping ability and dexterity were normal.  Claimant had marked decreased

sensation to pin prick of the right hand to the shoulder in a stocking glove type

pattern.

Examination of the lumbar sacral spine showed that she could squat 15

degrees, complaining of pain in her low back.  She could get up on her toes and take

---

[2]All of the medical records prior to the remand were summarized by the undersigned in
the Report and Recommendation issued in Docket No. 04-0437 (rec. doc. 11; Tr. 473-81).
Accordingly, only those records relating to the proceedings on remand are summarized herein.

a step, and could get back on her heels.  She had no spasm on the left, but some slight spasm in the right lumbar area.  She was tender at L4-L5, L5-S1 on the right and in the superior aspect of the right sacroiliac joint.

Claimant held her back in about 5 degrees forward flexion.  Range of motion was normal on forward flexion at 90 degrees.   Extension was 25 degrees, lateral flexion left was 30 degrees and right was 25 degrees.

Biceps reflexes were 1 + bilaterally, patella were 2 ½ + bilaterally, and Achilles were 2 ½ + on the left and 2 + on the right.  (Tr. 322).  The straight leg raises were negative.  Claimant's hips had full range of motion with no tenderness.  The knees had no swelling, ligamentous weakness, or effusion, and had full range of motion.

Claimant's ankles had normal dorsal and plantar flexion.  Babinski was negative.  She had some decreased sensation to pin prick on the medial and lateral aspect of the right leg, the upper thigh on the right leg, and at L5 S1 dorsal and plantar aspect of the left foot.

X-rays of the right hip appeared to be completely normal, with no fracture or necrosis.  There was fusion between the transverse process of L5 and S1 on the right, which had been reported as partial sacralization of L5.  There was some slight osteoarthritis, minimal, in the right sacroiliac joint.

4

Dr. Heitkamp's impression was fairly marked sacroileitis in the right and radiculopathy motor of the right cervical spine with weakness of muscles in the right arm, including the shoulder, elbow and hand.  He opined that claimant should not do any squatting, frequent bending, or prolonged standing, but that she could do some work in the seated position.  (Tr. 323).

Dr. Hetikamp noted that claimant had evidence of weakness of abduction and adduction of the right shoulder and flexion and extension of the biceps and triceps on the right.  He felt that she was not malingering with this, and that she had "some pressure on the border roots of the right upper arm."  He restricted her from working with her hands above her head.  He also felt that she should have an MRI of the cervical spine and an EMG and nerve conduction study of the upper extremities.

**(2)  Report from Dr. Thomas Montgomery dated January 28, 2004**. Claimant returned for follow up for a pelvic fracture four years prior.  (Tr. 539).  She complained of increased pain with cold weather and frequent headaches, for which she took Ultracet.  On examination, she had tenderness of the right SI joint area. Motor and sensory were fully intact, and she had full range of motion of her hips and pelvis.

X-rays showed a previous pelvic diastasis with fracture, and previous sacroiliac joint dislocation.  Dr. Montgomery's impression was pelvic fracture.  He noted that

claimant had had an extremely serious injury, and that she might always continue to have this problem.

**(3) Consultative Psychological Evaluation by Dr. Ed Bergeron dated October 25, 2004**.   Claimant was oriented to time, person, and place.   Her conversational content reflected low fund of language.  Memory was intact for recent and remote events.

Claimant presented as profoundly depressed, and evinced marked psychomotor retardation.   She disclosed that during her deeper states of depression, she experienced auditory hallucinations.  (Tr. 541).   She admitted that when she was depressed, she had no energy to perform her duties as a parent.  Her children had been placed in foster care.  (Tr. 540).   She was taking Zoloft, but complained that she derived minimal benefit from it.  (Tr. 541).

Administration of the WAIS revealed an IQ score of 72, which fell into the mild mental retardation to borderline range of functioning.  Administration of the Rorschach Inkblot Test showed that she was rather mentally limited, and possessed little insight, poor coping skills, and tendencies to engage in denial.  Her responses were also consistent with the diagnosis of major depression, recurrent, with psychotic features.

Dr. Bergeron determined that claimant suffered from recurring episodes of major depression which were so severe at times that she experienced auditory hallucinations. Additionally, she had endured a traumatic childhood which consisted of being physically, emotionally, and sexually abused. She reported that she experienced intrusive memories which caused her great distress, suggesting that she also suffered from post-traumatic stress disorder. (Tr. 541-42). Claimant also had a history regarding her interpersonal relationships, indicative of dependent personality disorder. (Tr. 542).

Based on claimant's evaluation, Dr. Bergeron could not recommend reunification at that time. He reported that she was in need of mental health services, which would need to include intense individual psychotherapy, group therapy for sexual trauma survivors, and a medication adjustment. He stated that she also needed to attend a parenting skills training program. He opined that reunification should not be attempted until she had completed her treatment plan and established a plan of stability. His impression was major depression, recurrent, with psychotic features, post-traumatic stress disorder, and dependent personality disorder.

**(4) Psychiatric Evaluation and Medication Order Sheet from Crowley Mental Health Center dated December 20, 2004 to January 4, 2005**. On December 20, 2004, claimant was admitted with major depressive disorder, recurrent,

severe, with psychotic features, and intermittent explosive disorder.  (Tr. 549).  Her Global Assessment of Functioning score was 40, and 60 for the past year.  She was prescribed Effexor and Seroquel.  (Tr. 543).

**(5) Consultative General Physical Examination by Dr. Raymond F. Taylor dated February 10, 2005**.  Claimant complained of pelvic pain with radiation to the right hip and the left leg down to the foot.  (Tr. 553).  She also complained of pain radiating from her hip to her shoulder blades, which caused headaches.  Her medications included Seroquel, Lortab, Ketorolac, Benalfaxine, and Bextra.  (Tr. 554).

On examination, claimant was 66 inches tall and weighed 144 pounds.  Range of motion of the neck was normal.  (Tr. 555).  Range of motion of the back was 0 to 15 degrees in extension, 0 to 60 degrees in forward flexion, and 0 to 30 degrees in right and left lateral flexion.  She had no muscle spasm.

Claimant had tenderness over the right sacroiliac joint.  Range of motion of the right hip was 0 to 30 degrees in flexion, and limited by pain.  Straight leg raising was negative.

Range of motion of the extremities was normal.  Claimant had no loss of muscle strength or muscle atrophy.  Her grip strength was excellent.  Manual dexterity and grasping ability were normal.

Aside from the right hip, claimant had no swelling, instability, or deformity of any of the joints.  Her gait and station was normal.  She could walk on her heels and toes without problems.

Neurologically, claimant was oriented to time, place, and person.  (Tr. 556).  Cranial nerves, motor nerve, and sensory nerve function were normal.  Deep tendon reflexes were normal.

Psychologically, claimant's behavior was appropriate.  Her thought content, affect, and mood were normal.  Concentrating ability and memory were normal.

X-rays of the hips and pelvis showed spurring over the right acetabulum, and some spurring off the left lateral pelvis.  Claimant had a heel fracture of the right pubic ramus.

Dr. Taylor's impression was right hip and leg pain, status-post fractured pelvis.  Based on his findings, he opined that her work-related activities should be limited to mainly sedentary-type activities.

**(6) Physical Residual Functional Capacity ("RFC") Assessment dated March 17, 2005**.  The examiner determined that claimant could lift/carry 20 pounds occasionally and 10 pounds frequently.  (Tr. 559).  She could stand/walk at least 2 hours, and sit about 6 hours, in an 8-hour workday.  She had unlimited push/pull ability.  She could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and

crawl, but never climb ladders/ropes/scaffolds.  (Tr. 560).

**(7) Mental RFC Assessment dated March 18, 2005**.  Dr. Joseph Kahler found that claimant was moderately limited as to her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 566-67).  Dr. Kahler determined that she appeared to be capable of simple work in a relatively low stress environment.  (Tr. 568).

**(8) Psychiatric Review Technique ("PRT") dated March 18, 2005**.  Dr. Kahler assessed claimant for organic mental disorders, affective disorders, anxiety-related disorders, personality disorders, and substance addiction disorders.  (Tr. 569). He determined that she had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.  (Tr. 579). He found that she appeared to retain the capacity for simple, unskilled work.  (Tr.

581).

**(9) Records from the Office of Mental Health dated May 19, 2005**.  Dr.
Kevin Young reported that claimant had been admitted on December 20, 2004, with
symptoms of depressed mood, sleep disturbance, anhedonia, loss of interest in normal
activities, decreased energy, impaired appetite, auditory hallucinations, fearfulness,
distractibility, questionable judgment and insight, psychomotor retardation, anxiety,
crying spells, and feelings of hopelessness.  (Tr. 625).  He diagnosed her with major
depressive disorder, recurrent, and severe with psychotic features, intermittent
explosive disorder, and personality disorder not otherwise specified.  She was
prescribed medication and counseling.

Since then, claimant had been seen on a monthly basis.  Her medications
included Seroquel and Lexapro.  She was last seen on May 12, 2005.  She had to quit
taking the medication because she was pregnant.  She was to continue with
counseling, and had been offered an anger management class.

**(10) Records from Abbeville General Hospital dated to March 5 to May**
**4, 2005**.  On March 5, 2005, claimant was admitted for abdominal pain and cramps
after lifting heavy furniture.  (Tr. 646-51).  The assessment was muscle strain.  (Tr.
647).  She was prescribed Vicoprofen.  (Tr. 653).

On May 4, 2005, claimant complained of pelvic pain. (Tr. 641). The impression was acute pelvic pain and pregnancy. (Tr. 631).

**(11) Claimant's Administrative Hearing Testimony**. At the hearing on August 3, 2005, claimant was 29 years old. (Tr. 669). She testified that she was 5 feet 7 inches tall, and weighed 145 pounds. (Tr. 669-70). She reported that her weight had gone down by about 10 pounds. (Tr. 670).

Claimant testified that she had three children, who were in OCS custody because of inadequate housing. She stated that she had driven a car, until it was towed away.

Claimant reported that she had completed the eighth grade. (Tr. 671). She stated that she could read and write. She testified that she had worked as a cook. (Tr. 672).

Regarding complaints, claimant testified that she sustained pelvic, right leg, right shoulder, neck, and elbow injuries after an automobile accident. (Tr. 672-73). She stated that she was receiving orthopedic therapy, but that it was not helping. (Tr. 674). She had not taken any pain medication for the past year and a half. (Tr. 678).

Additionally, claimant stated that she was being treated for her nerves and depression. (Tr. 678). She testified that she cried most of the time, and had difficulties when she could not get up and go anywhere because of her pain. (Tr.

12

687).  She reported that the medications had helped, but she had stopped taking them because she had become pregnant.  (Tr. 678-79).

Claimant also had problems with losing her temper.  (Tr. 679).  She said that she was attending a support group for abuse, which was helping her.  (Tr. 680).  She thought that her emotional problems would affect her ability to work, because she became mad easily.  (Tr. 681).  Additionally, she stated that she had trouble getting along with other people.  (Tr. 685).

As to restrictions, claimant testified that she could walk about 1 hour at the most when she was not hurting.  (Tr. 674).  On bad days, she could stand for only 15 to 30 minutes.  (Tr. 684).  She said that she could walk two blocks at the most.  (Tr. 677).

Claimant stated that she could sit for two to three hours.  (Tr. 674).  She reported that she hurt worse with weather changes, and had to lie down most of the time.  (Tr. 674).  She said that she had bad days more than half of the month.  (Tr. 676).

Additionally, claimant said that she could lift about five pounds comfortably. (Tr. 675).  She complained that she could not bring her arms over her head because of right shoulder pain.  (Tr. 676-77, 684).

Claimant stated that she smoked half a pack of cigarettes a day. (Tr. 674). She reported that she had stopped drinking two years prior. (Tr. 675). She stated that she had never taken illegal drugs.

Regarding activities, claimant testified that she picked up trash every now and then. (Tr. 676). She stated that she cooked and did laundry when she felt well. She reported that she needed a motorized shopping cart to get groceries.

Additionally, claimant stated that she played with her PlayStation when she was not in pain. (Tr. 677). She reported that she mowed the grass sometimes. She said that she had some friends who had stayed with her, but no longer did. (Tr. 677-78). She also watched television, listened to the radio, read, and wrote letters to her brother-in-law. (Tr. 682).

**(12) Administrative Hearing Testimony of Lester Soileau, Vocational Expert ("VE")**. Mr. Soileau classified claimant's past work as a fast food cook as skilled and medium, a cashier as semi-skilled and light, a stock clerk as semi-skilled and heavy, a kitchen helper as unskilled and medium, and a small products assembler as unskilled and light. (Tr. 690-91). The ALJ posed a hypothetical in which he asked the VE to assume a claimant of the same age, education, and work experience; who could lift and carry 10 pounds occasionally and 5 pounds frequently; could stand and walk for 2 hours in an 8-hour workday; could sit for 6 hours in an 8-hour workday;

could not do over the shoulder work with her right arm; could not do complex or detailed work, but could do simple one- and two-step jobs because of emotional problems, and needed limited interaction with the general public.  (Tr. 691).  In response, Mr. Soileau identified the job of assembler, of which there were 164,000 sedentary jobs nationally and 913 in Louisiana.  When the ALJ changed the hypothetical to add the limitation that more than half of her days were bad to where she had to lie down for protracted periods of time, the VE testified that she could not do these jobs.  (Tr. 692).  The ALJ then asked if she could do these jobs if she had bad days three or four times a month and could not work, to which Mr. Soileau testified that she could not.

Claimant's attorney then asked the VE whether the assembler jobs would require constant use of the hands.  (Tr. 693).  In response, he testified that they would. When the attorney asked whether a claimant who had a problem with repetitive use of the hands would probably be unsuccessful at these jobs, Mr. Soileau testified that she would.

The attorney asked whether a claimant with non-exertional impairments, such as being likely to have an altercation with a co-worker, cry at the workplace repeatedly, or exhibit inappropriate behavior such as excessive anger, would likely maintain employment, the VE answered that employers generally did not put up with

a lot of behavior of that nature.  (Tr. 693-94).  When the attorney added that the claimant would have difficulty accepting criticism and supervision, and would maybe cry or retort verbally to the employer and co-workers week-in and week-out, Mr. Soileau responded that such person would probably be unlikely to maintain employment.  (Tr. 694-95).  The attorney then questioned whether a person who suffered from hallucinations at the workplace would be likely to maintain employment, to which the VE responded that she probably would not.  (Tr. 695).

**(13) The ALJ's Findings**.  Claimant argues that: (1) the ALJ erred in failing to order the additional testing recommended by Dr. Heitkamp as ordered by the Court; (2) the ALJ erred in assessing claimant's residual functional capacity, resulting in an improper reliance on the vocational expert's testimony to find her not disabled, and (3) the VE's testimony supports a finding of disabled at Step 5.  Because I find that the ALJ erred in finding that claimant had the ability to maintain employment, I recommend that the Commissioner's decision be **REVERSED,** and that the claimant be awarded benefits.

At the outset, the undersigned observed that the ALJ failed comply with the Court's order remanding this case to order the testing of claimant's right arm as recommended by Dr. Harold Heitkamp and to assess her residual functional capacity in light of this impairment.  (Docket No. 04-0437, rec. docs. 11, 12).  While the ALJ

16

indicated at the hearing that he would consider claimant's attorney's argument that the Court had required additional testing, it does not appear that this was ever done. (Tr. 696-97).  The ALJ's failure to order this testing in compliance with the Court's order constituted error.

Besides the fact that the ALJ failed to order additional testing, the undersigned finds that the ALJ committed another error – namely, in failing to properly analyze claimant's residual functional capacity in light of her mental impairments.  While the ALJ found that she had "depression," the records reflect that her condition was much more severe than the ALJ had indicated.  (Tr. 429).

The consultative examiner, Dr. Ed Bergeron, noted that claimant suffered from recurring episodes of major depression which were so severe at times that she experienced auditory hallucinations.   (Tr. 541).  Additionally, she experienced intrusive memories which caused her great distress, suggesting that she also suffered from post-traumatic stress disorder.  (Tr. 541-42).  Claimant also had a history regarding her interpersonal relationships, indicative of dependent personality disorder.  (Tr. 542).

Based on claimant's evaluation, Dr. Bergeron could not recommend reunification at that time.  He reported that she was in need of mental health services, which would need to include *intense* individual psychotherapy, group therapy for

sexual trauma survivors, and a medication adjustment.  (emphasis added).  He opined that reunification should not be attempted until she had completed her treatment plan and established a plan of stability.  His impression was major depression, recurrent, with psychotic features, post-traumatic stress disorder, and dependent personality disorder.

Subsequent records from Crowley Mental Health Center indicate that claimant was still not at a stable point.  On May 19, 2005, Dr. Kevin Young reported that claimant had been admitted on December 20, 2004, with symptoms of depressed mood, sleep disturbance, anhedonia, loss of interest in normal activities, decreased energy, impaired appetite, auditory hallucinations, fearfulness, distractibility, questionable judgment and insight, psychomotor retardation, anxiety, crying spells, and feelings of hopelessness.  (Tr. 625).  He diagnosed her with major depressive disorder, recurrent, and severe with psychotic features, intermittent explosive disorder, and personality disorder not otherwise specified.  She was prescribed medication and counseling.

Since then, Dr. Young indicated that claimant had been seen on a monthly basis.  Her medications included Seroquel and Lexapro.  She was last seen on May 12, 2005.  She had to quit taking the medication because she was pregnant.  She was to continue with counseling, and had been offered an anger management class.

In the Mental RFC Assessment, Dr. Joseph Kahler found that claimant was *moderately* limited as to her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (emphasis added).  (Tr. 566-67).   In the PRT, he determined that she had mild restriction of activities of daily living, *moderate* difficulties in maintaining social functioning, *moderate* difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.  (emphasis added).  (Tr. 579).

At the hearing, claimant's attorney asked whether a claimant with non-exertional impairments who would be likely to have an altercation with a co-worker, cry at the workplace repeatedly, or exhibit inappropriate behavior such as excessive anger, would likely maintain employment.  (Tr. 693-94).  In response, Mr. Soileau answered that employers generally did not put up with a lot of behavior of that nature. (Tr. 694).  When the attorney added that the claimant would have difficulty accepting criticism and supervision, and would maybe cry or retort verbally to the employer and

co-workers week-in and week-out, Mr. Soileau responded that such person would probably be unlikely to maintain employment.  (Tr. 694-95).  The attorney then questioned whether a person who suffered from hallucinations would be likely to maintain employment, to which the VE responded that she probably would not.  (Tr. 695).

Mr. Soileau's testimony, along with the reports from Dr. Bergeron and Dr. Young, simply do not indicate  that claimant is capable of  working on a sustained basis at this time.  Dr. Bergeron reported that claimant was in need of mental health services, which would need to include intense individual psychotherapy, group therapy for sexual trauma survivors, and a medication adjustment.  (Tr. 542).  Dr. Young indicated that claimant was still being treated for major depressive disorder, recurrent, and severe with psychotic features, intermittent explosive disorder, and personality disorder not otherwise specified.  (Tr. 625).  Based on Mr. Soileau's testimony, a claimant who was experiencing behavior problems from these conditions would probably be unlikely to maintain employment.  (Tr. 693-94). There is no indication of malingering noted by any of the examiners. Given that claimant's evaluation included a test IQ score of 72, it is extremely doubtful that claimant has been able to successfully fool the various examiners who have examined and treated claimant for her mental and psychiatric disorders.

20

A finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job he finds for a significant period of time. *Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002) (citing *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986)).  According to the medical records, claimant would be unable to maintain gainful employment due to her mental impairments. Thus, the ALJ erred in his determination that claimant retains the capacity for work.  (Tr. 430-32).

Because I find that the ALJ erred in determining that claimant was capable of retaining the capacity for work, the undersigned recommends that the Commissioner's decision be **REVERSED**, and that the claimant be awarded appropriate benefits.  The undersigned recommends that September 24, 2001, which is date she applied for benefits, be used as the date for the commencement of benefits.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within ten (10) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed February 17, 2007, at Lafayette, Louisiana.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE